# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3232-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LARRY MCMILLAN a/k/a
LARRY M. MCMILLAN,
LARRY MCMILLIAN,

     Defendant-Appellant.

_____

Argued October 29, 2025 – Decided December 18, 2025

Before Judges Currier, Smith and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 21-12-3169.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Scott M. Welfel, of counsel and on the briefs).

Kevin J. Hein, Assistant Prosecutor, argued the cause for respondent (Grace C. MacAulay, Camden County Prosecutor, attorney; Kevin J. Hein, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

PER CURIAM

After a jury trial, defendant was convicted of simple and aggravated assault, harassment, false imprisonment and witness tampering offenses, arising out of a November 11, 2019 domestic dispute with his girlfriend A.M.[1] On appeal, defendant raises numerous challenges to the convictions and sentence. After careful review, we conclude the comments made by A.M. during her testimony were sufficiently prejudicial to require a mistrial. In addition, the jury instruction on the witness tampering charge unconstitutionally omitted essential language requiring proof of defendant's intent to tamper. As a result, we vacate the convictions and remand for a new trial.

## I.

In February 2020, a grand jury returned an indictment against defendant for: second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1) (count 1); third-degree aggravated assault on a domestic violence victim, N.J.S.A. 2C:12-1(b)(12) (count two); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(13)

---

[1] We use initials to protect the privacy of the victim. See R. 1:38-3(c)(12).

(count three); third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count four); and third-degree criminal restraint, N.J.S.A. 2C:13-2(a) (count five).

November 11, 2019 Incident

On November 11, 2019, A.M. returned to her apartment in the evening. Defendant was already there. As A.M. got out of her car, she stopped to speak with an ex-boyfriend for "[a] few minutes" until defendant came out of her apartment and told her to come inside. A.M. stated that defendant was "angry" she was talking to a former boyfriend and in the apartment he also argued with her "about messages that he found in [her] phone."

According to A.M., the argument continued and defendant punched her in the stomach. She ran into her bedroom and pushed a dresser against the door to prevent him from entering but defendant banged on the door and eventually broke it down. A.M. stated that defendant threatened to kill her. She testified defendant grabbed her and "slammed" her on the couch, jumped on top of her, and began strangling her with both hands. A.M. tried to "grab" defendant and asked him to stop but defendant again said he was going to kill her. A.M. stated she lost consciousness for what "felt" like a few minutes and when she regained consciousness, she realized she had urinated on herself.

A-3232-22

A.M. said defendant was still in the apartment and he told her to get up and lay down with him. A.M. refused, and when she tried to leave the apartment, defendant "grabbed" her and hit her in her stomach. A.M. eventually acquiesced and laid down in her bed with him. She testified that when she tried to get up from the bed, defendant "would look at [her] and like jump up, like where the f[**]k you think you going," so she stayed in bed with him all night. A.M. stated she did not have access to her phone because defendant had taken it earlier.

The following morning, defendant gave A.M. her phone and left for work. After speaking with her sister, A.M. went to the police station where she was interviewed. While at the station, Sergeant Pascual Irizarry took pictures of A.M.'s face, arms, and body. Irizarry testified that the only injury he saw was "a little laceration on the left side of [A.M.'s] nose, by her left eye." He did not see any bruising around her neck or on any other parts of her body. After leaving the station, A.M. went back to her apartment, where she continued to reside with defendant.

A.M. further testified that on November 20, 2019, defendant tried to "attack" her again and she had to "jump out the window" and go to a neighbor's house to call the police. The police arrested defendant that day and charged him with the offenses arising from the November 11 incident.

4

The following testimony gave rise to defendant's request for a mistrial:

> [THE STATE]: What made you change from accepting phone calls and writing letters on his behalf [while defendant was detained] to no longer having contact with him?
>
> [A.M.]: I chose to no longer allow him to manipulate me.
>
> [THE STATE]: What do you mean by that?
>
> [A.M.]: Since I dealt with him, that's all he ever did was manipulate me, play mind games with me. When I first started dealing with [defendant], I was [sixteen] years old. He was [thirty-one]—

Defense counsel objected and moved for a mistrial. The prosecutor told the court she had instructed A.M. regarding her testimony and asked the court to also tell A.M. not to testify to that information again. The court denied the motion, finding a curative instruction was sufficient to rectify the comments. Thereafter, the judge instructed the jury:

> I am going to instruct you not to consider as part of your deliberations the testimony that [A.M.] just made regarding the time in which—their ages when they were messing[2] with each other. Okay? That's not to be part

---

[2] At sidebar, defense counsel thought he heard A.M. say they were "messing" with each other as opposed to "dealing" with each other. However, during a break, the court played back the audio from the testimony and confirmed that A.M. said she had been "dealing" with defendant. The court asked defense counsel if he wanted the court to correct the language for the jury, but counsel declined.

of your deliberations. I am striking it from the record. You should not consider it whatsoever.

On cross-examination, the defense played an April 13, 2020 phone call from A.M. to defendant in jail in which defendant asked A.M. if she wished he was dead, A.M. said "no", but she felt like she could "kill" defendant. Defense counsel asked:

> Q. [Y]ou said, "I could kill you. I never in my life felt like this before," right, in that phone call?
>
> A. Yes.
>
> Q. You were as angry as you've ever been in your life at [defendant]?
>
> A. No. That's not what I meant. He manipulated me literally since I've been dealing with him. Back when I first met him, I was [sixteen] years old.
>
> Q. Okay I am going to ask you yes or no . . .
>
> A. He did nothing but . . . manipulate me. You're taking it the wrong way. Don't . . . do that.
>
> Q. I am going to ask you a yes or no question.
>
> A. Don't do that, don't do that. You're taking it the wrong way. Please.
>
> Q. Again, you're . . .
>
> A. Don't try to manipulate me like he did all of my life. Don't do that. You knew exactly what I meant by that.

A-3232-22

Q. "I will kill you."

A. Come on.

Q. "I never in my life felt like this." That's what you said, right?

A. For all he put me through.

Q. Yes or no?

A. I'm a battered—

Q. That's all I'm asking.

A. —woman. I'm . . . I'm . . . I'm . . .

Q. "I will kill you."

A. He even manipulated me—

Q. "I never in my life felt like this."

A. —all my life, literally since I was [sixteen] years old. Like, come on. If I wanted to kill him, come on, like, really?

Q. "I will kill you."

A. You're taking it the wrong way. You're misinterpreting what I said.

Q. Are you able to answer a yes or no . . .

A. That's my answer.

Q. —question?

7

A. That's my answer. You're misinterpreting what I said.

Q. You were jealous of a bitch, right?

A. Back when I was [sixteen] . . .

Q. Yes or no.

A. —and he was a rapist . . .

   . . . .

A. —a pervert . . .

Q. —jealous of a bitch . . .

A. —messing with young girls. Yes, way back when. Way before this incident happened.

   . . . .

A. This was back in . . .

Q. —you said that you were jealous of a bitch.

A. Back in 2000 and . . . probably, what, six, 2008 maybe? That was way back then. We're not talking about now. That's . . . he went to jail for six years.

Q. No. You can . . .

A. Came home. We're not talking about that.

[Defense counsel]: All right, Your Honor. If we can approach.

The Court: Sure.

[A.M.] Because you . . . don't make that out, like, I am . . . like, don't . . . don't do that. You know the, kind of, person he is. He's a monster. Ask him what he went to jail for.

At sidebar, defendant again moved for a mistrial due to A.M.'s statements that their relationship began when she was sixteen years old, he was a rapist, and he was previously incarcerated. The court found that the comments did not warrant a mistrial and that it could instruct the jury to disregard them. The court also found A.M. was not attempting to undermine the trial but rather "[i]t just came out because she was emotional about it."

The court then addressed A.M. and instructed her that if she was asked a yes or no question, she had to answer accordingly. The court also told her not to repeat her previous remarks:

> The Court: [B]ut I don't want you to talk about the other women . . . that are [sixteen] years old.
>
> [A.M.]: I didn't talk about the other women. He brought that up.
>
> The Court: I don't want you to talk about him being incarcerated in the past. I don't want to hear that, okay, because it affects the fairness of the trial . . .
>
> [A.M.]: It tells who he is also.
>
> The Court: —and I don't want you to call him a rapist.
>
> [A.M.]: I won't.

9

The Court: Okay?

[A.M.]: You got it.

The Court: Okay?

[A.M.]: I am sorry, Your Honor.

When the jury returned, the court instructed them to disregard A.M.'s comments:

> Members of the Jury, before we continue, I want to give you an instruction. Before we took this break, you heard [A.M.] mention certain things about [defendant] that were in the past. I instruct you to disregard those statements. They are being stricken from the record. They should not play any role in your deliberations. They are not relevant. Okay. Let's continue with the cross examination.[3]

Despite the court's directive, A.M. again referenced defendant's criminal past:

> Q. You guys had been living together for three months?
>
> A. Right.
>
> Q. How long had you been dating up until that point?
>
> A. Well, since he . . . I don't know how to answer because I . . . I might say the wrong thing.

---

[3] The court offered to give the jury a more detailed instruction, spelling out the specific objectionable testimony. Defense counsel agreed with the phrasing of the instruction as given.

The Court: No. He's asking you. So . . .

A. Since he came home from jail or since I first met him? Like, I'm trying to understand . . .

Q. Were you guys dating the whole time?

A. No. He went to jail for six years. When he came home, that's when we started dating again.

Q. So, how long had you been dating?

A. Overall or once he came home from jail?

Q. How long had you been dating in 2019?

A. For a few . . . it's probably a few months. I want to say probably, what, about maybe five months, six months maybe.

Defendant did not object to the testimony. There were no further instructions given to the jury.

Defendant's Letters and Recorded Phone Calls to A.M.

The following testimony provides the basis for the witness tampering charges. According to A.M., after defendant was arrested, she began receiving letters from him. In one letter, defendant stated that he was "locked up for something that didn't happen." He further said, "I'm sorry for not believing you, I really thought it was just . . . you being evil. For you to go down [to the police station] about our shoving match[] and then say something other than that as a

11

result of someone else['s] agenda can't fall on you." Defendant wrote, "[t]his will be the last time I ask you to do the right thing by us, they don[']t give a f[**]k about us. Write my attorney and inform her that s[**]t wasn't true and how it came about."

In another letter, defendant sent A.M. a draft of an affidavit that he wanted her to rewrite and send to his attorney. The affidavit stated in relevant part, "I, [A.M.], states [sic] that the . . . allegation made against [L]arry McMillan was falsified by the investigating [o]fficer" and asked the judge to drop all charges against defendant. A.M. testified that she never prepared the affidavit requested by defendant because she "didn't want to lie."

A.M. also testified that an investigator from defense counsel's office came to her workplace requesting her to sign a typed statement. She stated she signed the statement because the investigator "was causing a lot of confusion" and she wanted "to get it away." The statement, dated January 15, 2020, read:

> I don't want to pursue charges against Larry McMillan from November 11, 2019 for aggravated assault and criminal restraint, nor cooperate with the [S]tate. I am not afraid of him and I don't want him to stay in jail because it is not helping him. It only makes it worse for him mentally. I want him to get out of jail as soon as possible.
>
> I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements

made by me are willfully false, I am subject to punishment.

In further support of the witness-tampering charge, the State played a number of phone calls made by defendant to A.M. while he was incarcerated. In a March 1, 2020 call, defendant told A.M.:

> I just think you just need to come up here and get with the lawyer and tell them that you want me out like I want him out today . . . I want him home today . . . just like that and then [the lawyer] might just say tell the Judge or she might just say um . . . ain't nothing that you can do . . . I don't know but I think that's what you should come up here and tell her . . . .

The following day, defendant and A.M. discussed the statement A.M. had provided to his attorney's investigator. Defendant was upset that the affidavit would not be helpful to his case, and he suggested that A.M. needed to provide another written statement, saying:

> [Defendant]: Why is it so hard for you to write this statement? I'm not coercing you or asking you to do anything that's not right.
>
> [A.M.]: It's not but . . .
>
> [Defendant]: [A.M.], . . . I'm in here for something I didn't do. I'm in here for something that didn't happen. So, why is it so hard . . . for the truth just to be told? Why is that so difficult? I'm your f[*****]g life, that's what you told me I am. I'm sitting in this cell . . . .

13

Defendant also told A.M. that he reviewed the transcript of A.M.'s interview with the police:

> [Defendant]: So, babe, like I said, that's not . . . that stuff is not what bothered me . . . going through that. What bothered me is when they gave me the transcripts . . . and it just hurt[] me to read some of the things that you were saying. Um, it . . . ha[s] you saying like . . . see, I don't know if the transcripts are made up or what but I wanna see the video. Um, it . . . ha[s] you saying that I choked you to the point where you passed out and pissed on yourself and I repeatedly . . .
>
> [A.M.]: It can't say that cause that's not what I said.
>
> [Defendant]: Babe, I'm not gonna lie to you, I swear to God it says that. That's what the transcripts say. It says it a couple times and it also asks you again and um . . . it made like . . . I'm not a monster. I would never do that to you. I would never make you go unconscious and pee on yourself and then, make . . . and then, what's so sickening about it, . . . I made you lay in your piss. Like, that's . . . that's just . . . [inaudible]
>
> [A.M.]: You made me lay in pee. I didn't say that. And I'm not even gonna say, I didn't say that anymore. 'Cause I know that . . . that I know I didn't say.

In another call on March 4, 2020, defendant inquired why A.M. had not yet provided an additional written statement:

> [Defendant]: Oh. Why you um . . . why you never sent that letter off to the judge yet?
>
> [A.M.]: 'Cause I kind of forgot and then, when she was . . . [inaudible]

14

. . . .

[Defendant]: Babe, all you gotta do is give them a statement saying, it's not true.

[A.M.]: But I don't want them to think that [inaudible][.]

[Defendant]: [A.M.], you never passed out. You never pissed on yourself. The more I read this s[**]t, me punching you and making you lay in your piss . . . I'm not that type of dude.

[A.M.]: I don't understand where that came from, that's what's driving me crazy.

[Defendant]: [inaudible] I'm . . . I'm . . . look, . . . even if I smack you, choke you, I didn't do this s[**]t they f[*****]g said, I did, man. This is what's holding me the f[**]k in jail, this . . . the lying part. This . . . this s[**]t, you losing consciousness, you never lost . . . I would never f[*****]g . . . .

During her trial testimony, A.M. stated she lost consciousness after defendant choked her on November 11, 2019. She explained that what she meant on the call when she denied making certain statements to police, was that she did lay in her urine "but . . . wouldn't say [defendant] told [her], lay there in it." A.M. said she continued to accept defendant's phone calls after he was arrested because she "felt bad for him" and, at the time, she loved him.

In another March 4, 2020 call, defendant and A.M. continued to discuss the issue:

[Defendant]:  I said the only way I'm com[ing] home . . . if you tell them that . . . that stuff didn't happen . . . like babe me and you been in a lot of physical altercation[s] . . . .

[A.M.]:  And they gonna say . . . oh well why would you say that . . . .

[Defendant]:  How they gonna say that . . . you not in the[ir] presence . . . it's in an affidavit . . . don't put your . . . you know put yourself in the[ir] presence . . . send my attorney a[n] affidavit . . . you got to think about it . . . I'm locked up for something that bro . . . babe you didn't pass out or nothing . . . okay let's just say I dragged you up and down the steps down the block everything[.]  [L]et's say I punched you in your face[.]  I'm not locked up for just punching you in your face. I'm not just locked up for choking you[.]  [L]ike you . . . you can't sleep well babe . . . if . . . if you know I'm locked up for something that ain't happen to you.

          . . . .

[Defendant]:  I'm ready to get out of here man I'm really ready if I . . . if all those things happen[ed] to you . . . on my watch . . . under me . . . I eat that . . . I'll stay in here until . . . even if you  don't want to . . . let's just say all that stuff did happen and you didn't want to see . . . you didn't want you . . . you didn't want to testify . . . then I know I would've had to stay in here until it was time for me to go to trial . . . but I believe in my heart it's totally unfair I got to sit in here and they got . . . they gonna hold me on some . . . on . . . on some . . . on some fabricate[d] s[**]t that was said that . . . that didn't take place  I didn't make you lay in no urine[.]

[A.M.]:  And I never said that.

16

The State also played a call from March 5, 2020, where defendant again raised the issue:

> [Defendant]:  I wanna . . . I would like to be home with you by, by your birthday . . . [inaudible].
>
> [A.M.]:  So what do you suggest I do?
>
> [Defendant]:  Just tell them what was said is not true babe, you know it's not so why would you . . . let me ask you this . . .
>
> [A.M.]:  You keep saying I know it's not, I told them what happened!
>
>     . . . .
>
> [Defendant]:  Babe I already told you . . . if you didn't say it, if you said it that's one thing, if you didn't say it write the judge babe, you gotta let them know, write the, write my [redacted] and let them know and get it notarized.  I can't force you to do anything you don't want to do, what's right is right and what's wrong is wrong.  All I ask is I don't want to sit in here for something I did not do I didn't make you pass out.  I didn't . . . make you urinate on yourself, I didn't constantly punch you in your face and your body make you lay in piss.
>
> [A.M.]:  Yo, every time you say that . . .
>
> [Defendant]:  And you laugh?
>
> [A.M.]:  I'm like . . .
>
> [Defendant]:  That's funny?

17

[A.M.]: Cause I don't mean to laugh cause is like come on bro. I woul[d]'ve gave up by now like alright yeah I said that, I shouldn't probably shouldn't said that, I ain't know it was gonna go that far, but like come on I don't, I don't f[*****]g know what they heard or what they thought they heard.

....

[A.M.]: [T]his s[**]t is annoying because [y]o I didn't f[*****]g say that.

On a March 23, 2020, call, defendant asked A.M. why she had not yet written an affidavit:

[A.M.]: I said cause I haven't gotten to it[.]

[Defendant]: Why? I'm ready to get out of here. I'm sitting here for some s[**]t I shouldn't be sitting here on. My lawyer's talking to the [p]rosecutors . . . and they haven't received anything from you. I told her that you sent the [p]rosecutor something[.] Prosecutor talked to her today she said they haven't received anything from you.

[A.M.]: You said send it to the [j]udge you never said nothing about the [p]rosecutor.

[Defendant]: [A.M.]?

[A.M.]: Yeah?

[Defendant]: That letter in reference that you passing out, urinating on yourself and going unconscious, need a letter saying that ain't happen. I need that ASAP. I been here four, five months now, enough is enough. Still picking up this phone calling you[,] communicate

18

with you, talk with you, making plans with you, and I'm still sitting here for something that didn't happen. Even if I punched you in your face or I or I, or I knock you down 20 flights of steps, you still didn't pass out and piss . . . and urinate on yourself.

In a March 19, 2020 call, defendant told A.M. that he had received a video recording of her November 12, 2019 interview with police:

[Defendant]: I said I watched the video.

[A.M.]: You watched the video?

[Defendant]: Yeah. I finally got it a couple of days. About four days ago.

[A.M.]: And it said that—

[laughter]

[A.M.]: [inaudible]

[laughter]

[Defendant]: Yeah.

[A.M.]: Well, this is [unintelligible].

[Defendant]: I started laughing.

[A.M.]: And it said—

[Defendant]: What?

[A.M.]: No, 'cause it said that you—I said that you made me, uh—

[Defendant]:  Everything, yeah.

[A.M.]:  —you're talking about made me losing my pee[?]

[Defendant]:  Yep.  Everything.  I can't believe it.

[A.M.]:  I said that.

[Defendant]:  You did, huh?

[A.M.]:  Mm.

[Defendant]:  I ain't gonna even lie.  That s[**]t was funny, baby.  I couldn't believe it.  [laughter]  Like, I'm really thinking it's—

[A.M.]:  It's more about funny [inaudible]

[Defendant]:  No, listen, it is funny 'cause I'm sitting here thinking like—

[A.M.]:  [inaudible]

[Defendant]:  Listen, this is how I gotta take things in stride.  I can't be here all bitter and mad, upset, angry. . . .  I'm like, okay.  I just started f[*****]g laughing.  Guard said, "[w]hat you laughing about here?"  I said, "I don't know man.  I just gotta laugh right now."  He said, "[y]eah maybe that's the best thing to do."  I said, "[n]ah, that's what I'm gonna do."  But um, yeah, that s[**]t was funny, bro.  You would've—you would've enjoyed it.  I may—I might have to um, save that maybe one day we get some popcorn and watch it.

[A.M.]:  That's sound funny.

A-3232-22

When asked about the colloquy, A.M. testified that she was laughing because defendant laughed first.

The defense also played a recorded phone call from April 13, 2020, where A.M. vented to defendant about their relationship and the "hurt" that she "endured" from him. During the call, defendant asked A.M. if she wished he was dead, and A.M. responded "I wouldn't say that. No, I wouldn't say that. I wouldn't say that, but I feel like I-I-I could kill you. Like, and . . . [I've] never in my life felt like this before, but, bro, like, I can literally kill you . . . ."

On October 28, 2022, the jury returned the following verdict: on count one, guilty of the lesser-included offense of simple assault; on count two, guilty of the lesser-included offense of simple assault; on count three, guilty of aggravated assault, strangulation on a domestic violence victim; on count four, guilty of the lesser-included offense of harassment; on count five, guilty of the lesser-included offense of false imprisonment; and on count six, guilty of tampering with a witness.

The court imposed a persistent offender extended term and sentenced defendant to an aggregate term of thirteen years in prison with six and a half years of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

II.

On appeal, defendant raises the following issues in a counseled brief for our consideration:

> POINT I
> REVERSAL IS REQUIRED BECAUSE THE JURY WAS IRREPARABLY PREJUDICED BY (1) [A.M.]'S REMARKS THAT DEFENDANT WAS A RAPIST, PERVERT, "MESSED" WITH YOUNG GIRLS, AND WENT TO JAIL FOR SIX YEARS AND (2) THE ERRONEOUS ADMISSION OF [A.M.]'S ACCUSATION THAT DEFENDANT STRANGLED HER A SECOND TIME ON THE DATE OF HIS ARREST AND TRIED TO SEND HER SISTER MONEY TO BUY DRUGS.
>
> A. The Court Erred In Denying A Mistrial After [A.M.] Testified That Defendant Was A Rapist, Pervert, "Messed" With Young Girls, And Went To Jail For Six Years.
>
> B. The Court Erred In Admitting [A.M.]'s Accusation That Defendant Strangled Her A Second Time On The Date Of His Arrest And Tried To Give Her Sister Money To Buy Drugs.
>
> C. Given The Weaknesses In The State's Case, This Inadmissible Other Bad Acts Evidence Was Harmful, Separately And Cumulatively, And Deprived Defendant Of A Fair Trial.
>
> POINT II
> DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE COURT'S WITNESS TAMPERING CHARGE FAILED TO INSTRUCT THE JURY (A) THAT THE STATE WAS REQUIRED

22

TO PROVE DEFENDANT INTENDED HIS COMMUNCIATIONS TO CAUSE [A.M.] TO TESTIFY FALSELY AND (B) THAT THE DEFENSE INVESTIGATOR'S COMMUNICATIONS WITH [A.M.] COULD NOT BE CONSIDERED AS EVIDENCE OF WITNESS TAMPERING.

A. The Jury Charge For Witness Tampering Violated The First Amendment Because The Court Failed To Instruct The Jury That In Order To Convict It Had To Find Defendant Intended His Communications To Cause [A.M.] To Testify Falsely.

B. Defendant's Sixth Amendment Right To Counsel Was Violated By The Court's Failure To Instruct The Jury That The Statement The Defense Investigator Obtained From [A.M.] Was Not Evidence Of Witness Tampering Because A Defendant Has A Constitutional Right To Have An Investigator Interview A Witness.

C. The Jury Instruction Errors Require Reversal Of All Defendant's Convictions.

POINT III
THE COURT ERRED IN BARRING DEFENSE COUNSEL FROM CROSS EXAMINING THE VICTIM REGARDING HER CONDUCT DURING THE OCTOBER 14 INCIDENT OR HER PENDING CHARGE.

POINT IV
THE COURT ERRED BY FAILING TO GRANT DEFENDANT'S REQUEST FOR AN ADVERSE INFERENCE INSTRUCTION ADDRESSING THE STATE'S FAILURE TO CALL MALIK SMITH AS A WITNESS.

POINT V

THE PROSECUTOR IN SUMMATION IMPROPERLY COMMENTED ON THE DEFENDANT'S FAILURE TO TESTIFY AND ASKED THE JURY TO "STAND UP FOR" THE VICTIM.

POINT VI

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.

POINT VII

DEFENDANT'S SENTENCE VIOLATED HIS CONSTITUTIONAL RIGHTS TO A JURY TRIAL AND INDICTMENT BY THE GRAND JURY.

A. Because Neither The Grand Jury Nor Petit Jury Found That Defendant Was Convicted Of Two Predicate Crimes "Committed At Different Times" Or That His Current Offense Was Committed Within Ten Years Of His Last Release From Incarceration Or Last Offense, Imposition Of A Persistent Offender Extended Term Violated His Constitutional Rights To A Jury Trial And Indictment By The Grand Jury.

B. Because Neither The Grand Jury Nor Petit Jury Found That Defendant "Committed At Least One Act Of Domestic Violence On More Than One Occasion," The Finding Of Aggravating Factor Fifteen Was Unconstitutional.

Defendant adds the following arguments in a self-represented supplemental brief:

24

POINT I
DEFENDANT'S CONVICTION ON COUNT 3 MUST BE REVERSED BECAUSE HE WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL WHERE THE JURY CHARGE FOR AGGRAVATED ASSAULT (STRANGULATION OF A DOMESTIC VIOLENCE VICTIM) WAS INACCURATE AND CLEARLY CAPABLE OF PRODUCING AN UNJUST RESULT.

POINT II
DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE HE WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL WHEN THE STATE'S KEY FACT WITNESS (THE VICTIM) INTENTIONALLY INTERJECTED FALSE AND MALICIOUS TESTIMONY IMPLYING THAT THE DEFENDANT HAD A PRIOR CONVICTION AND PRISON SENTENCE FOR SEXUAL CONTACT WITH YOUNG GIRLS.

POINT III
THE JURY CLEARLY REJECTED THE STATE'S THEORY OF SERIOUS OR SIGNIFICANT BODILY INJURY TO THE VICTIM AND RETURNED GUILTY VERDICTS FOR SIMPLE ASSAULT AS THE LESSER-INCLUDED OFFENSES FOR COUNTS 1 AND 2, WHICH CONTAIN COMMON INJURY ELEMENTS CHARGED IN COUNT 3. IN LIGHT OF THE JURY'S LESSER INCLUDED FINDINGS FOR COUNTS 1 AND 2 AND THE PRINCIPLES ESTABLISHED PURSUANT TO N.J.R.E. 2:10-2, THE CONVICTION FOR A THIRD-DEGREE OFFENSE ON COUNT 3-BASED ON THE IDENTICAL INJURY EVIDENCE-CONSTITUTES AN UNJUST RESULT. THIS COURT SHOULD VACATE THE CONVICTIONS ON COUNTS 2 AND

25

3 AND REMAND FOR RESENTENCING. IN THE ALTERNATIVE, THIS COURT SHOULD REMAND WITH INSTRUCTIONS TO AMEND AND RESENTENCE ON COUNT 3 TO A FOURTH-DEGREE SIMPLE ASSAULT DISORDERLY PERSONS OFFENSE.

POINT IV
DEFENDANT WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY AND A FAIR TRIAL WHERE THE STATE UTILIZED A PARADE OF UNIFORMED OFFICERS TO ESCORT THE STATE'S KEY WITNESS TO-AND-FROM THE WITNESS STAND WHILE IN THE PRESENCE OF THE JURY TO ALLEGEDLY "PROTECT" HER FROM THE DEFENDANT.

A.

We begin with a consideration of defendant's Point I and supplemental Point II—in which he contends A.M. made prejudicial comments that deprived him of a fair trial. Specifically, defendant points to his second request for a mistrial following A.M.'s comments that he was a "rapist," "pervert," "messed with young girls," and went to jail for six years. He contends that although the court issued a curative instruction, it was inadequate to cure the taint because the language used by the court suggested that A.M.'s comments were true, A.M.'s comments were so damaging that no curative instruction could have remedied the prejudice, and the court failed to issue a curative instruction after

26

A.M. repeated her comments. Defendant also argues he was prejudiced by A.M.'s bad acts testimony that he strangled her on a second occasion (the date of his November 20, 2019 arrest).

"Whether an event at trial justifies a mistrial is a decision 'entrusted to the sound discretion of the trial court.'" State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)). We "'will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" Ibid. (quoting State v. Jackson, 211 N.J. 394, 407 (2012)). If there are alternative courses of action, such as giving the jury a curative instruction, a trial court should not grant a mistrial. Ibid.

A curative instruction is "sometimes required to address testimony that should not have been heard by the jury." State v. McKinney, 223 N.J. 475, 497 (2015). "[T]he decision to provide a curative instruction and the content of that statement is left to the discretion of the trial judge." Ibid. When determining whether a curative instruction is appropriate, the trial court should consider: (1) "the nature of the inadmissible evidence the jury heard, and its prejudicial effect"; (2) the proposed "instruction's timing and substance"; and (3) the court's "tolerance for the risk of imperfect compliance." State v. Herbert, 457 N.J.

Super. 490, 505-07 (App. Div. 2019). Courts presume that a jury followed a trial court's instruction. State v. Burns, 192 N.J. 312, 335 (2007).

Further, when a defendant does not object to an alleged trial error, it may nonetheless be considered by this court if it meets the plain error standard of Rule 2:10-2. State v. Singh, 245 N.J. 1, 13 (2021). The plain error standard requires a determination of: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' [Rule] 2:10-2; that is, whether there is a 'reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016)). Generally, a curative instruction "must be firm, clear, and accomplished without delay." State v. Vallejo, 198 N.J. 122, 134 (2009).

Under N.J.R.E. 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition." "The underlying danger of admitting other-crime evidence is that the jury may convict the defendant because he is 'a "bad" person in general.'" State v. Cofield, 127 N.J. 328, 336 (1992) (quoting State v. Gibbons, 105 N.J. 67, 77 (1987)); see also Herbert, 457 N.J. Super. at 509 ("Evidence of past criminality risks conviction

because the jury may conclude defendant is a bad person with a propensity to commit crimes.").

Under Cofield, evidence must satisfy a four-prong test to be admissible under N.J.R.E. 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. at 338.]

"[E]vidence is still subject to exclusion where a court finds that the probative value of the otherwise inadmissible responsive evidence 'is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury . . . .'" State v. James, 144 N.J. 538, 554 (1996) (quoting N.J.R.E. 403).

The State does not dispute that A.M.'s comments were inadmissible under Rule 404 and unduly prejudicial under Rule 403. However, it contends that the trial court's curative instructions alleviated the prejudice caused by the

29

comments.  We agree that the court's first curative instruction was clear, firm, and timely.  The court specifically told the jury to disregard A.M.'s comment regarding her and defendant's ages when they first met and struck the comment from the record.  However, thereafter, A.M. continued to make prejudicial, disparaging, and inflammatory remarks during her unresponsive cross-examination.

A.M. elaborated on her earlier comments, stating that defendant was a "rapist," "a pervert," that he had been "messing with young girls," and he had previously been imprisoned for six years.  A.M.'s comments painted defendant as a rapist and a pedophile, offenses for which he was not charged and not on trial and thus, were prejudicial.  Although the court provided another curative instruction, telling the jury they should disregard A.M.'s comments regarding "certain things . . . that were in the past," it was not sufficient to alleviate the taint of A.M.'s comments.  A.M.'s comments were highly inflammatory, and the court failed to specifically address the gravity of the remarks.

Further, despite two prior curative instructions to the jury and a direct instruction to A.M. to refrain from making these prejudicial comments, she again told the jury that defendant had previously been incarcerated.  On this occasion, she intentionally repeated three times that defendant had previously

been in prison. This time, defendant did not object and the court did not issue a curative instruction or otherwise reprimand A.M.

A.M.'s repeating that defendant was a rapist and insinuating that he was a pedophile allowed the jury to make an impermissible inference—that defendant was guilty because he had a propensity for crime against females. A.M.'s testimony created an atmosphere where the jury was deciding defendant's character rather than his guilt on the specific charges. The comments here were not fleeting or inadvertent; they were repeated, which compounded their prejudicial effect on the jury. See Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) ("Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair.").

A.M.'s comments are also particularly concerning because she was the only witness who could establish the State's case. Aside from Sergeant Irizarry, A.M. was the sole State witness. We disagree with the State's contention that there was overwhelming evidence of defendant's guilt. Other than one picture taken the day after the November 11, 2019 incident showing a small laceration on her nose, there was no independent corroboration for A.M.'s claim that defendant punched and choked her on the day in question.

31

Thus, because the State's case hinged on A.M.'s credibility, the jury was focused on A.M.'s testimony. While A.M.'s evasion of defense counsel's questions and repeatedly making improper comments could have led the jury to discredit her testimony altogether, the comments could have also caused the jury to believe that defendant was a rapist and pedophile.

The jury's verdict acquitting defendant on counts one, two, four, and five, but finding him guilty of lesser-included offenses shows that the jury did not find A.M.'s testimony entirely credible. But there is a danger that since A.M.'s comments were so prejudicial and repeated, and the court did not forcefully condemn them in its second curative instruction, and failed to say anything when A.M. made additional improper comments a third time, that the jury was inclined to convict defendant because they believed A.M.'s comments that defendant was a bad person. In sum, the cumulative nature of A.M.'s comments denied defendant a fair trial.

## B.

In Point II, defendant argues that because he never threatened A.M. or explicitly asked her to lie, his speech was protected by the First Amendment. Therefore, the trial court had to instruct the jury that the State needed to prove that defendant intended his speech to cause A.M. to testify falsely. He contends

that the error in the jury instruction could have affected the jury's consideration of his other charges.

Defendant did not object to the court's instruction on the witness tampering count. Therefore, we review the jury charge under the plain error standard, which considers whether the error was "clearly capable of producing an unjust result." State v. Munafo, 222 N.J. 480, 488 (2015) (quoting R. 2:10-2).

It is well established that "[a]ppropriate and proper charges to a jury are essential for a fair trial." State v. Daniels, 224 N.J. 168, 180 (2016) (citing State v. Savage, 172 N.J. 374, 387 (2002)). "[E]rroneous instructions on material points are presumed to be reversible error." State v. Carrero, 229 N.J. 118, 127 (2017) (quoting State v. Nelson, 173 N.J. 417, 446 (2002)). "The test to be applied . . . is whether the charge as a whole is misleading, or sets forth accurately and fairly the controlling principles of law." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)).

The trial court's jury instruction tracked the model jury charge in place at that time. Model Jury Charge (Criminal), "Tampering with Witnesses and Informants" (N.J.S.A. 2C:28-5(a)) (Cases arising after September 10, 2008)

(approved Mar. 16, 2009). Accordingly, the court instructed the jury it needed to find that "defendant knowingly engaged in conduct[,] which a reasonable person would believe would cause a witness or informant to testify or inform falsely."

In January 2024, while defendant's appeal was pending, our Supreme Court issued its decision in State v. Hill, 256 N.J. 266 (2024). Hill was charged with first degree carjacking after the victim identified him from a photo array. Id. at 273. While he was awaiting trial, Hill sent a letter to the victim's home stating, in part, "I am sorry to hear about the ordeal you had to endure but unfortunately, an innocent man (me) is being held accountable for it" and "I'm writing a respectful request to you. If it's me that you're claiming as the actor of this crime without a doubt, then disregard this correspondence. Otherwise please tell the truth if you're wrong or not sure 100%." Id. at 274.

Hill was subsequently charged with witness tampering in violation of N.J.S.A. 2C:28-5(a). Ibid. The letter to the victim was admitted into evidence at the trial in support of the charge. Id. at 275. The trial court instructed the jury in accordance with the same model jury charge used in this case. Id. at 276. On appeal from his conviction of witness tampering, the defendant argued the jury instruction violated his First Amendment right to free speech because the

jury did not find that he knew his speech or conduct would cause the witness to testify falsely. Id. at 278.

The Court addressed whether N.J.S.A. 2C:28-5(a) was unconstitutionally overbroad because it required "only a mens rea of negligence" when, according to Hill, the First Amendment requires "at least a mens rea of recklessness" to criminalize speech under the "true threat" exception. Id. at 278, 291. The Court stated that "[a] true threat is speech that, when taken in context, objectively threatens unlawful violence," while "[s]peech integral to criminal conduct is speech that is 'intended to bring about a particular unlawful act.'" Id. at 282 (quoting United States v. Hansen, 599 U.S. 762, 783 (2023)). The Court concluded that for "witness tampering prosecutions that do involve speech, garden-variety prosecutions are consistent with the First Amendment and Article I, Paragraph 6 of the New Jersey Constitution because they involve speech that is integral to criminal conduct and is thus unprotected." Id. at 286. Thus, it did not find that N.J.S.A. 2C:28-5(a) was unconstitutionally overbroad. Id. at 289.

Nevertheless, the Court went on to find that the statute "may have been unconstitutionally applied to" Hill "because he was prosecuted for the contents of his letter and the jury was not required to find that his letter constituted speech

integral to criminal conduct." Ibid. The Court reasoned that the defendant's prosecution was based on his speech because the State told the jury to look at the contents of the letter to determine whether the defendant violated N.J.S.A. 2C:28-5(a). Id. at 290. The Court concluded that the relevant First Amendment exception was whether the speech was integral to criminal conduct. Id. at 291. However, the letter Hill sent did not ask the victim "to testify falsely, withhold testimony, elude legal process, absent herself from any proceeding, or otherwise obstruct, delay, prevent or impede any official proceeding or investigation." Ibid. Rather, the Court concluded that the letter was "facially innocuous," and to show that the speech was integral to witness tampering, "the State was required to prove that [the] defendant intended the letter to cause [the victim] to testify falsely . . . ." Ibid.

It is clear the State here relied on the content of defendant's speech to prosecute him for witness tampering. The recorded jail calls were played for the jury and admitted into evidence and the jury was provided with listening aids to follow the recordings. The State emphasized defendant's recorded statements during its summation, where it replayed clips of the calls. The State also read defendant's letters to A.M. during its closing argument. As Hill posited, if the State had intended to prosecute defendant solely for his conduct and not his

speech, it could have completely redacted the letters and not relied on defendant's recorded statements. 256 N.J. at 291. It did not do so. Instead, the crux of the State's case was that defendant's communications to A.M. constituted witness tampering.

We must consider then whether the speech was "facially innocuous." Id. at 291. The State contends that defendant's statements were not facially innocuous because he "openly encouraged [A.M.] to testify against her consistent claims that defendant choked her to the point of passing out and caused her to urinate on herself."

Our review of the communications reflects that a juror might conclude that defendant certainly encouraged A.M. to recant her statements, but he did not explicitly ask her to lie, withhold testimony, absent herself from trial, or threaten her. Defendant's letter asked A.M. to "do the right thing." And, in the recorded calls, he told her to tell his attorney "that you want me out," asked her to tell the "truth," repeatedly claimed, "I didn't do this s[**]t they f[*****]g said," and asked A.M. to write the judge "if you didn't say it." Moreover, when defendant denied choking A.M. and causing her to urinate on herself, she repeatedly agreed with him that she never made such claims. The jury might conclude, after being charged with the Hill instruction, that none of these

statements were "open encouragement" to testify falsely and that defendant's speech was facially innocuous. Thus, the jury should have been instructed that they had to find defendant's statements were "speech integral to criminal conduct," intended to cause A.M. to testify falsely. 256 N.J. at 290, 291.

The court's instruction on the witness tampering charge failed to charge the jury on intent, a critical element of the offense. Some errors, such as failure to charge an element of an offense, hinder the jury's function, requiring presumptive reversal, even absent a timely objection by counsel. See State v. Afanador, 151 N.J. 41, 56 (1997); State v. Hodde, 181 N.J. 375, 384 (2004). We are satisfied this constituted plain error, that is, it had the clear capacity to bring about an unjust result. State v. Montalvo, 229 N.J. 300, 320-21 (2017).

The jury might find defendant's statements did not contain explicit threats or requests to lie. In the recorded calls, defendant repeatedly denied making A.M. urinate on herself and at times, A.M. agreed with defendant, stating "that's not what I said" and that she did not "understand where that [statement] came from." The jury could have found that since A.M. agreed with defendant that the statements were false, he did not intend to cause her to testify falsely. As defendant argues, the fact that the jury was not required to find that he intended

for his statements to cause A.M. to provide false testimony could have led the jury to view his other charges in another light.

As stated, we have found the egregious, repetitive, prejudicial comments made by A.M. warranted a mistrial. Assuming the State pursues the witness tampering charges, the court shall instruct the jury in accordance with Hill in the new trial.

In light of our determination to grant a new trial, we need not consider defendant's remaining arguments on appeal regarding evidentiary issues and prosecutorial misconduct during summation. As to defendant's contentions regarding his sentence, we only comment that if defendant is convicted of certain offenses and the State seeks to impose an extended term under N.J.S.A. 2C:44-3(a), a jury must determine defendant's eligibility for the extended term as prescribed under Erlinger v. United States, 602 U.S. 821 (2024). See also State v. Carlton, 480 N.J. Super. 311, 355 (App. Div. 2024).

Reversed. The judgment of conviction is vacated, and we remand for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hadley

Clerk of the Appellate Division